## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **TENRGYS, LLC** | **CASE NO. 21-01515-JAW** |
| **TELLUS ENERGY, LLC** | **CASE NO. 21-01516-JAW** |
| **TOP TEN HOLDINGS, LLC** | **CASE NO. 21-01517-JAW** |
| **TREETOP MIDSTREAM SERVICES, LLC** | **CASE NO. 21-01518-JAW** |
| **ACADIANA MINERAL OWNERS, LLC** | **CASE NO. 21-01519-JAW** |
| **ANTIOCH PIPELINE COMPANY, LLC** | **CASE NO. 21-01546-JAW** |
| **BAX, LLC** | **CASE NO. 21-01520-JAW** |
| **BOE, LLC** | **CASE NO. 21-01521-JAW** |
| **BGGCO, LLC** | **CASE NO. 21-01537-JAW** |
| **BT LANDS, LLC** | **CASE NO. 21-01538-JAW** |
| **BXO LANDS, LLC** | **CASE NO. 21-01539-JAW** |
| **COHAY CONSERVATION AREA, LLC** | **CASE NO. 21-01540-JAW** |
| **COHAY WILDLIFE, LLC** | **CASE NO. 21-01541-JAW** |
| **EUTAW VENTURES, LLC** | **CASE NO. 21-01522-JAW** |
| **GREENLEAF CO2 SOLUTIONS, LLC** | **CASE NO. 21-01542-JAW** |
| **HIGHLAND COLONY CAPITAL, LLC** | **CASE NO. 21-01543-JAW** |
| **JURASSIC SEISMIC COMPANY** | **CASE NO. 21-01549-JAW** |
| **LASO, LLC** | **CASE NO. 21-01523-JAW** |
| **LEAF RIVER LAND CO., LLC** | **CASE NO. 21-01544-JAW** |
| **NOMS, LLC** | **CASE NO. 21-01524-JAW** |
| **NORTH COHAY, LLC** | **CASE NO. 21-01525-JAW** |
| **PCE, LLC** | **CASE NO. 21-01526-JAW** |
| **RFND, LLC** | **CASE NO. 21-01527-JAW** |
| **RFS, LLC** | **CASE NO. 21-01528-JAW** |
| **SNPI, LLC** | **CASE NO. 21-01529-JAW** |
| **SOUTH COHAY, LLC** | **CASE NO. 21-01530-JAW** |
| **STP VENTURES, LLC** | **CASE NO. 21-01531-JAW** |
| **TALLAHALA EXPLORATION, LLC** | **CASE NO. 21-01532-JAW** |
| **TELPICO USA, LLC** | **CASE NO. 21-01533-JAW** |
| **TC ENERGY, LLC** | **CASE NO. 21-01534-JAW** |
| **TPCO, LLC** | **CASE NO. 21-01545-JAW** |
| **WCOA, LLC** | **CASE NO. 21-01535-JAW** |
| **WYC LANDS, LLC** | **CASE NO  21-01547-JAW** |
| **XLAKE PIPELINE COMPANY, LLC** | **CASE NO. 21-01548-JAW** |
| **DEBTORS** | **CHAPTER 11** |

---

## DECLARATION OF RICHARD H. MILLS, JR.
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

---

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 4

I.      The Debtors and Their Business ........................................................................ 4
        A.    The Debtor Companies ................................................................................ 4
        B.    Governance of the Debtors ......................................................................... 7
        C.    A Brief Description of the Debtors' Business .............................................. 9

II.     Tellus Operating Group, LLC, the Services it Provides to the Debtors,
        and the Compensation it Receives ................................................................. 10
        A.    Services Provided by Tellus Operating Group ............................................ 10
        B.    Supplemental Overhead Fees from the Upstream Debtors ......................... 13
        C.    Contract Services Agreements with Tenrgys and the Midstream Debtors ... 14
        D.    Additional Services TOG Provides to all Debtors ..................................... 14

III.    Utility Services .................................................................................................. 15

IV.     Employees of Treetop Midstream Services, LLC ........................................... 16

V.      The Debtors' Cash Management System ........................................................ 18
        A.    Domestic Operations and Tellus Operating Group ................................... 18
        B.    The JPMorgan Chase Bank Accounts ....................................................... 22
        C.    The Origin Bank Account ......................................................................... 23

VI.     Cash Collateral .................................................................................................. 23

VII.    Capital Structure ............................................................................................... 25
        A.    The 2012 Secured Loan ............................................................................. 26
        B.    The 2013 Unsecured Term Loan ............................................................... 27

VIII.   Events Leading to Bankruptcy ......................................................................... 27
        A.    Collapse of Oil Prices in 2014 and 2015 ................................................... 27
        B.    Divestitures of Assets in 2016 and 2017 .................................................... 28
        C.    Loss of the Sale of Baxterville Field in 2017 ............................................. 29
        D.    PanAm's Initial Involvement in 2019 ....................................................... 31
        E.    Letter of Understanding in April 2019 ..................................................... 32
        F.    Letter of Intent in September 2019 ........................................................... 33
        G.    PanAm Changes the Terms of the Colombian Assets. ............................... 34
        H.    PanAm Aborts a Scheduled Closing in January 2021 ............................... 36
        I.    PanAm Aborts Another Scheduled Closing in June 2021 .......................... 39
        J.    PanAm's Proposed Certificate of Designation ........................................... 40

IX.     Restructuring Support Agreement with EIG ................................................. 42

X.      Joint Plan of Reorganization ........................................................................... 43
        A.    Colombian Collateral Tender Transaction ................................................ 43
        B.    Treatment of EIG's 2013 Term Loan Claim ............................................. 44
        C.    Exit Financing .......................................................................................... 45
        D.    Governance ............................................................................................... 45
        E.    Recoveries to Other Claim Holders ........................................................... 45

XI.     First Day Motions ............................................................................................. 46

## Declaration

I, Richard H. Mills, Jr., pursuant to Section 1746 of Title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Manager of Tenrgys, LLC, a Mississippi limited liability company ("Tenrgys" or the "Company"). Tenrgys is a privately owned oil and gas exploration and development company, and is the direct or indirect parent of each of the debtor companies listed in the above caption. Tenrgys and the debtors in each of the above-captioned cases are, collectively, the "Debtors." I have been the Manager of Tenrgys since it was organized in 2002. I am Manager of each of the Debtors other than Debtor Jurassic Seismic Company ("Jurassic") and have been Manager of each since its inception.

2.      Unlike the other Debtors, which are LLCs, Jurassic is a Delaware corporation. Jurassic generally acts through its president, Michael Mills, but I am one of its directors and I have personal knowledge regarding the business and operations of Jurassic.

3.      I am familiar with the Debtors' business and financial affairs and am authorized to submit this Declaration on behalf of the Debtors. Unless otherwise indicated, all facts set out in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based on my experience and knowledge. If called as a witness, I could and would testify to the facts set out in this Declaration.

4.      I submit this declaration ("Declaration") to assist the Court and parties in interest in understanding the Debtors' business and the circumstances that led to the commencement of these chapter 11 cases (these "Chapter 11 Cases") and to provide evidentiary support for (a) the Debtors' petitions for relief under Chapter 11 of Title 11 of United States Code 11 U.S.C. §§ 101-

1532 ("Bankruptcy Code") filed on the date hereof ("Petition Date"), and (b) the emergency relief the Debtors have requested from the Court in the motions and applications described herein (collectively, "First Day Motions").

### Preliminary Statement

5.      The Debtors have two outstanding funded debt facilities: a secured credit facility with approximately $54 million of principal outstanding, all of which debt is held by PanAm and an unsecured term loan of approximately $75 million, all of which is held by EIG. Both the secured facility and the unsecured facility have matured and have not been repaid. For nearly two and a half years, the Debtors have tried to achieve a consensual, out-of-court restructuring with the support of both PanAm and EIG. In particular, over the last several months, both EIG and the Debtors have been prepared to execute several iterations of restructuring transactions; each time, PanAm has ultimately refused to sign a deal on terms that it previously indicated support for, and that reflected continued, material concessions from the Debtors and EIG. Meanwhile, PanAm recently sent the Company a notice of default and demanded payment of past due interest. Though the demand has been withdrawn, the likelihood of foreclosure or other value destructive action by PanAm remains. Accordingly, shortly before the filing of these Chapter 11 Cases, the Debtors and EIG entered into a restructuring support agreement in which EIG agreed to support the Debtors' plan of reorganization, which the Debtors intend to present to the Court in short order.

## I.      The Debtors and Their Business

### A.      *The Debtor Companies*

6.      Tenrgys is an independent oil and gas company formed as a Mississippi limited liability company in 2002. The other Debtors are direct or indirect wholly owned subsidiaries of Tenrgys. The Debtors are engaged in the business of exploration, production, sales and

transportation of oil and gas. Most of the Debtors' oil and gas production is in Mississippi, with a small amount of production in Louisiana. One of Tenrgys' subsidiaries (not a Debtor) is engaged in oil and gas exploration in Colombia, as explained below.

7.     The Debtors maintain their principal offices at 602 Crescent Place, Ridgeland, Mississippi 39157.

8.     Approximately 41.8% of the membership interest in Tenrgys is owned, directly or indirectly, by its management and other persons who are or were employed by Tellus Operating Group, LLC. The remaining approximately 58.2% of the membership interest in Tenrgys is owned by over 200 other members.

9.     Tenrgys has three direct wholly owned direct subsidiaries: Tellus Energy, LLC, Treetop Midstream Services, LLC, and Top Ten Holdings, LLC.

10.     **Tellus Energy, LLC**, and most of the Debtors which are its subsidiaries own mineral interests, mostly mineral leasehold interests, from which they produce oil and gas. Tellus Energy, LLC has the following wholly owned, direct subsidiaries, each of which is a Debtor, and each of which owns mineral interests. In the oil and gas industry, the production of oil and gas is commonly referred to as the upstream part of the industry. For purposes of this Declaration, Tellus Energy, LLC and the Debtors listed below are referred to as the "Upstream Debtors."

> Acadiana Mineral Owners, LLC
> BAX, LLC
> BOE, LLC
> Eutaw Ventures, LLC
> LASO, LLC
> NOMS, LLC
> North Cohay, LLC
> PCE, LLC
> RFND, LLC
> RFS, LLC
> SNPI, LLC
> South Cohay, LLC
> STP Ventures, LLC

> Tallahala Exploration, LLC
> TC ENERGY, LLC
> Telpico USA, LLC
> WCOA, LLC

11.     An indirect subsidiary, Jurassic Seismic Company (a Debtor), owned by Telpico USA, LLC, owns data obtained from geophysical surveys and other intellectual property useful in the oil and gas industry.

12.     In addition, Tellus Energy, LLC has a wholly owned direct subsidiary, Telpico, LLC. Telpico, LLC, through its branch, Telpico Colombia, LLC, owns valuable oil and gas concessions in Colombia and is engaged in exploration and development in the lands covered by those concessions. Telpico, LLC is not a Debtor, but is a guarantor of Tenrgys' obligations under the loans described in the "Capital Structure" section starting on page 25, below.

13.     **Treetop Midstream Services, LLC** and its subsidiaries own and operate pipelines and related infrastructure needed to process and transport oil and gas and carbon dioxide. The transportation and processing segment of the oil and gas industry is commonly referred as the midstream part of the industry. Treetop Midstream Services, LLC has the following wholly owned direct subsidiaries, each of which is a Debtor. For purposes of this Declaration, Treetop Midstream Services, LLC and the Debtors listed below are referred to as the "Midstream Debtors."

> Antioch Pipeline Company, LLC
> BGGCO, LLC
> Greenleaf CO2 Solutions, LLC
> Highland Colony Capital, LLC
> TPCO, LLC
> XLAKE Pipeline Company, LLC

14.     In addition, Treetop Midstream Services, LLC, through its subsidiary Highland Colony Capital, LLC, has an interest in Bluetick, Inc., a company which provides cloud based

scada solutions delivering real time field data communication services to oil and gas and water industries. Bluetick, Inc. is not a Debtor.

15.     **Top Ten Holdings, LLC** and its subsidiaries own surface land interests related to the Debtors' oil and gas production, and various other assets. Top Ten Holdings, LLC has the following wholly owned direct subsidiaries, each of which is a Debtor. For purposes of this Declaration, Top Ten Holdings, LLC and the Debtors listed below are referred to as the "Real Estate Debtors."

> BT Lands, LLC
> BXO Lands, LLC
> Cohay Conservation Area, LLC
> Cohay Wildlife, LLC
> Leaf River Land Co., LLC
> WYC Lands, LLC

16.     An organizational chart showing Tenrgys and its subsidiaries is attached hereto as Exhibit "A."

**B.     *Governance of the Debtors***

17.     Tenrgys operates pursuant to the Tenrgys, LLC Amended and Restated Limited Liability Company Agreement dated as of March 22, 2013 (the "LLC Agreement"). I am the Initial Manager of Tenrgys under the LLC Agreement. As Manager, I have sole authority to manage the Company, am authorized to make any contracts, enter into hedging and other transactions, and make and obtain any commitments on behalf of the Company to conduct or further the Company's business, subject to approval of certain specified actions. I have the sole authority to admit new Members, to issue additional membership interests, to divide new membership interests into one or more classes, and to determine the powers, privileges, duties, liabilities and obligations of each class of membership interest.

18.    A vote of 67% of the membership interest (a "67% Membership Interest Act") is required to (i) change or reorganize the Company into any other legal form, (ii) require any Member to make any contribution to the Company not provided for in the Member's contribution agreement, the Company's Certificate of Formation, or the LLC Agreement, (iii) act in contravention of the material terms of the LLC Agreement, (iv) merge or consolidate the Company, (v) sell all or substantially all of the operating assets of the Company, (vi) dissolve the Company, (vii) authorize the Company to borrow more than $100 Million, or (viii) make any single capital expenditure in excess of $100 Million.

19.    A vote of 75% of the membership interest (a "75% Membership Interest Act") is required to amend the LLC Agreement.

20.    The LLC Agreement provides for a board of directors (the "Board of Directors") consisting of no fewer than three and no more than nine directors (each a "Director"). As Initial Manager, I am a Director, and I appoint the other Directors. The Manager cannot authorize Tenrgys to borrow more than $50 Million for any single purpose, authorize the indemnification of the Manager or a Director, or make distributions in kind to any member without the approval of the Board of Directors. Other than these rights of approval, the Board of Directors functions generally in an advisory capacity. Currently, the Directors are Hans Krause, Jim McBride, Walter Neely, Roy Ward, Catherine Wohner, and me.

21.    I may be removed as Initial Manager only for good cause shown (i) by 67% Membership Interest Act, if cause is the Initial Manager's conviction of a felony that directly relates to the Company or the Company's assets or business operations, or (ii) by a 75% Membership Interest Act, if cause is the Initial Manager's conviction of crimes other than misdemeanors, or is due to a court's final non-appealable determination of the Initial Manager's intentional wrongful acts against the Company.

22.     In addition to being the Initial Manager of Tenrgys, I am the Manager of each Debtor other than Jurassic, and have been their Manager since their inception. In such capacity, I have sole authority to manage the business of each Debtor other than Jurassic, which generally acts through its president, Michael Mills.

### C.      A Brief Description of the Debtors' Business

23.     The Debtors operate an independent oil and natural gas business. As of September 1, 2021, the Debtors have 11 productive fields and fieldwide units in Mississippi and Louisiana.

24.     The Upstream Debtors own mineral interests, usually in the form of oil, gas, and mineral leases ("Oil and Gas Lease"), which grant to the lessee the exclusive right to, among other things, explore for, extract, and produce the minerals covered by the lease. Most Oil and Gas Leases are for a term of years and so long thereafter as minerals are produced in paying quantities. As part of the consideration for the lease, the mineral owners receive a share of the production or payments in lieu of a share of production (a "Royalty Payment").

25.     Commonly, production of oil and gas involves an agreement between an operator and the owners of mineral rights. In such projects, the owners of the rights to explore and produce the minerals, whether they are the actual owners of the minerals or lessees under oil and gas leases, are called "Working Interest Owners." The operator is called the "Operator." The agreement among the parties may be called a Joint Operating Agreement or a Unit Operating Agreement, depending on the scope of the agreement, but for purposes of this Declaration, I will refer to all such agreements as an "Operating Agreement." The Operator conducts or contracts for the work needed to explore for and produce oil and gas. The Operator charges the Working Interest Owners their *pro rata* share of expenses through Joint Interest Billings ("JIB" or "JIBs") and distributes to the Working Interest Owners their *pro rata* share of the revenue from the proceeds of production.

## II.    Tellus Operating Group, LLC, the Services it Provides to the Debtors, and the Compensation it Receives

### A.    *Services Provided by Tellus Operating Group*

26.    Tellus Operating Group, LLC ("TOG") is the Operator of nearly all of the Debtors' oil and gas fields. TOG and Tenrgys are affiliates. Reveille Management, Inc. owns 100% of the membership interest in TOG and, through a subsidiary, owns approximately 37% of the membership interest in Tenrgys. The shareholders of Reveille Management, Inc., who are generally current or former employees of TOG, have indirect beneficial ownership interest in both Tenrgys and TOG. However, TOG is an independent company that provides services to the Debtors only on a contractual basis. TOG is not a Debtor.

27.    The services TOG provides to the Debtors under the Operating Agreements include (but are not limited to) the following:

(a)    securing pooling agreements, permits from governmental authorities, surface rights, and appropriate drilling equipment as may be necessary to operate the oil and gas leases for which TOG is the operator;

(b)    preparing and recording pooling designations or declarations;

(c)    conducting hearings before governmental agencies for the securing of spacing or pooling orders;

(d)    hiring, training, paying, and supervising all the employees used to conduct operations;

(e)    carrying out operations proposed by Working Interest Owners, including, but not limited to, (i) drilling, reworking, deepening, recompleting, or sidetracking wells; (ii) plugging back a dry hole drilled; and (iii) reentry and use of any plugged and/or abandoned wells;

(f)    negotiating contracts on a competitive basis for the drilling of wells and other required services;

(g)    contracting with its affiliate Treetop Midstream Services, LLC and other third parties for acquiring, constructing, and operating plants, facilities, gathering lines, and pipelines (including for the injection, compression, handling, processing and treatment of $CO_2$), to service its producing fields;

(h)       purchasing, acquiring, injecting, producing, recovering, reinjecting, recirculating, and/or recycling $CO_2$ and natural gas in enhanced recovery operations in fieldwide units;

(i)        carrying out pressuring, repressuring and pressure maintenance operations, cycling operations, water flooding, secondary recovery operations, and tertiary operations, in any combination(s) or sequence(s) thereof;

(j)        monitoring wells in order to assess, monitor, perform remedial work, and/or ensure the integrity of operations of the wells and fields;

(k)       negotiating contracts for the sale of extracted hydrocarbons, collecting the proceeds from such sale(s) and other production, apportioning such proceeds among the various Working Interest Owners, and applying or otherwise disbursing such proceeds under the terms of the applicable Operating Agreement;

(l)        making and maintaining books and records relating to operations, including (but not limited to) forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets, and reports of stock on hand, and accounting records of the joint account showing expenses incurred and charges and credits made and received;

(m)     promptly paying and discharging expenses incurred in the development and operation of the field, and charging each of the Working Interest Owners with their respective proportionate shares of the expenses;

(n)       paying Royalty Payments, and paying such rentals, shut-in well payments, and minimum royalties as may be required under the terms of any lease;

(o)       timely paying *ad valorem* taxes on all property subject to the Operating Agreements;

(p)       taking steps to deal with any explosion, fire, flood or other sudden emergency, whether of the same or different nature, so as to safeguard life and property;

(q)       complying with applicable worker's compensation laws and carrying or providing insurance for the benefit of the joint account of the parties to the Operating Agreement;

(r)       executing on behalf of each party to the Operating Agreements such evidence as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service to demonstrate that such parties have elected to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal

Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder; and

(s)   exercising discretion to settle any single uninsured third-party damage claim or suit arising from operations if the expenditure does not exceed the limit pre-set by the Working Interest Owners (as low as $35,000 and much higher in some instances) and if the payment is in complete settlement of such claim or suit.

28.   In addition to being entitled to recover its operating costs and expenses from Working Interest Owners, TOG is also entitled under the Operating Agreements to be compensated for administrative and other services it provides to Working Interest Owners such as the Upstream Debtors. Such compensation generally is set forth in an exhibit attached to each Operating Agreement, in a form titled *Accounting Procedure—Joint Operations*, which is promulgated by the Council of Petroleum Accountants Societies ("COPAS"). Accordingly, the compensation due to TOG for the services it performs as operator under the Operating Agreements is generally referred to as "COPAS Fees." All of the COPAS Fees charged by TOG are governed by the customary COPAS accounting provisions on which virtually all oil and gas industry participants rely.

29.   The Operating Agreements and the services TOG provides to the Upstream Debtors under the Operating Agreements are critical to the continued operation of the Debtors' business. Without TOG operating the Debtors' oil and gas fields and providing other services under the Operating Agreements and other TOG agreements, the Debtors would have no readily available means of generating revenue from their primary oil and gas assets and the Debtors would not have sufficient capital to meet their ongoing obligations to other parties in the ordinary course.

### B.  Supplemental Overhead Fees from the Upstream Debtors

30.  The services TOG provides to the Upstream Debtors under the Operating Agreements are typical of the services that operators like TOG normally provide to owners of non-operated Working Interests like those of the Upstream Debtors. TOG also incurs additional costs and provides additional services to and on behalf of the Upstream Debtors, beyond the standard administrative services that TOG provides to third-party Working Interest Owners under the Operating Agreements. The additional costs incurred and services provided by TOG to or on behalf of the Upstream Debtors include, but are not limited to:

(a)  costs incurred to assist in managing the Upstream Debtors' properties, such as internal legal, land, geological, engineering, drafting, petrophysical, geophysical, accounting, and data-processing services;

(b)  financial and tax reporting services;

(c)  conducting meetings and preparing information mailings;

(d)  other ordinary and necessary communications; and

(e)  other such internal services performed by TOG on behalf of the Upstream Debtors' properties.

31.  The COPAS Fees TOG receives from the Upstream Debtors under the Operating Agreements do not fully compensate TOG for these additional services and their related costs. Accordingly, the Upstream Debtors agreed in their LLC operating agreements to pay to TOG a "Supplemental Overhead Fee" of up to 30% of the COPAS Fees owed by each Upstream Debtor on a monthly basis.

32.  For the same reasons as noted above, the additional services TOG provides to the Upstream Debtors in exchange for the Supplemental Overhead Fees are critical to the continued operation of the Debtors' business.

### C.     *Contract Services Agreements with Tenrgys and the Midstream Debtors*

33.     TOG likewise provides additional services to Tenrgys and the Midstream Debtors, including under a *Contract Services Agreement* dated April 7, 2014 and accompanying *Statement of Work* of the same date, as modified and amended by an *Interoffice Memorandum* and *Statement of Work First Amendment* dated August 22, 2014, all of which are referred to collectively as the "Services Agreement." Under the terms of the Services Agreement, TOG provides numerous back office and other services to Tenrgys, including but not limited to accounting support services, cash management services, legal support, banking support, financial services, management support services and lobbying as needed.

34.     For the services TOG provides to Tenrgys under the Services Agreement, Tenrgys pays TOG a management fee equal to 0.75% of Tenrgys' consolidated gross revenue.

35.     TOG also provides the Midstream Debtors and the Real Estate Debtors with services substantially similar to the foregoing, for which the Midstream Debtors and the Real Estate Debtors pay TOG management fees equal to 5% of their gross revenue. These agreements are evidenced by, among other possible things, an *Acknowledgement of Contract Services Agreements and Similar Agreements Between Tenrgys, LLC and its Subsidiaries, and Tellus Operating Group, LLC* (the "Services Acknowledgement").

### D.     *Additional Services TOG Provides to all Debtors*

36.     TOG also absorbs, among other things, the costs of the principal offices of Debtors such as rent, building maintenance and repairs, *ad valorem* taxes on the real and personal property, janitorial services, office security services, postage, and telephone and other utilities. Tenrgys and its subsidiaries further benefit from the office equipment, software, and IT services that TOG maintains and provides for use by the Debtors. TOG is also allocated a part of the insurance costs.

37.     TOG pays for such expenses using the COPAS Fees, Supplemental Overhead Fees, and other fees TOG earns from the Debtors, and from the COPAS fees TOG earns from other, unaffiliated non-Debtor Working Interest Owners under the various Operating Agreements described above.

38.     In short, under the Operating Agreements, the Services Agreement, and the other agreements described above, TOG operates substantially all of the business and properties of the Debtors, and in return, TOG is entitled to reimbursement of expenses and receipt of fees. Nevertheless, despite their close relationship and commonality of control, TOG has no equity, bonus, or other such incentive agreements with any of the Debtors. In the ordinary course of business, TOG sometimes pays bonuses to its own employees in connection with work performed at the field level, but those bonuses are paid out of COPAS Fees that TOG already receives, which are charged to *all* owners of non-operating Working Interests in that field, not just the Upstream Debtors.

39.     The Debtors are generally current on all payments owed to TOG. However, due to normal processing time, the next payments that will come due in the ordinary course of business will likely include prepetition services performed or costs incurred by TOG for the Debtors.

III.    **Utility Services**

40.     In connection with the operation of their businesses and management of their properties, certain of the Debtors obtain electricity, telecommunications, waste-removal, and water services (collectively, the "Utility Services") from a number of utility companies or brokers (collectively, the "Utility Companies").

41.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these Chapter 11 Cases. The Debtors must maintain

the ability to run their production equipment in a near-constant state. The Debtors' operations also require electricity and gas for lighting, heating, and air conditioning. In addition to the production processes conducted in the field, the Debtors operate corporate offices, as well as several regional and field offices responsible for ensuring the smooth operation of the Debtors' businesses. These offices require electricity, telecommunications, water, and waste management services to operate in each of their respective locations. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts. Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

42.     To the best of my knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services. Over the past 12 months, the Debtors paid an average of approximately $13,480 each month for third-party Utility Services. Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $13,480. To the best of my knowledge, the Debtors do not have any existing prepayments with respect to any Utility Companies and none of the Utility Companies hold deposits from any of the Debtors.

**IV.     Employees of Treetop Midstream Services, LLC**

43.     As of the Petition Date, Debtor Treetop Midstream Services, LLC ("Treetop") employs a total of eight (8) full-time (the "Employees"). Of these Employees, seven are salaried Employees and one is an hourly Employee. In the ordinary course of its business, Treetop incurs payroll and various other obligations and provides other benefits to its Employees for the performance of services.

44.     Treetop has incurred obligations to its Employees in the period prior to the Petition Date. Certain of these costs and obligations are outstanding, due and payable, while others will become due and payable in the ordinary course of Treetop's business after the Petition Date. Treetop's current estimated monthly gross payroll is approximately $77,500 for the Employees. As of the Petition Date, Treetop estimates it has approximately $45,000 outstanding in accrued prepetition compensation.

45.     Treetop is required by law to withhold from the Employees' salaries and wages amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes and to remit such amounts to appropriate agencies. Treetop is also required to make payments from its own funds on account of Social Security and Medicare taxes and other obligations such as unemployment insurance.

46.     Treetop's average monthly liability for withholding and other obligations as of the Petition Date is approximately $21,000, of which approximately $15,500 is withheld from Employees' paychecks and approximately $5,500 is paid by Treetop. As of the Petition Date, Treetop estimates it is current with such obligations for all Employees and accordingly owes only *de minimis* amounts, if any, to the taxing authorities relating to the prepetition period.

47.     In addition, in the ordinary course of processing payroll checks for its Employees, Treetop may be required to withhold certain amounts for various garnishments. As of the Petition Date, however, Treetop is not withholding any amounts on account of any garnishments and, accordingly, does not owe any amounts on account of any garnishments.

48.     Treetop customarily reimburses certain of its Employees for a variety of business expenses incurred in the ordinary course of employment. As of the Petition Date, Treetop estimates that there are no accrued and unpaid prepetition reimbursements outstanding. There

is no way to determine the precise amount of such reimbursements, but any change to prepetition reimbursements is likely to be relatively small.

49.     Treetop is party to a client services agreement with ADP TotalSource ("ADP") for matters such as payroll processing and tax filing. ADP's compensation is approximately $1,900 per year for the aforementioned services. As of the Petition Date, Treetop believes that it is current with all amounts owed to ADP and, accordingly, owes only *de minimis* amounts, if any, relating to the prepetition period.

50.     In the ordinary course of business, Treetop has established various benefit plans and policies for its Employees, which include medical insurance, dental insurance, vision care, life insurance, long- and short-term disability insurance, and flexible spending programs, paid time off plans, accidental death and dismemberment program, and a 401(k) plan (the "Employee Benefit Plans").

51.     Treetop believes that its annual expenditures under the Employee Benefit Plans aggregate to approximately $130,000. As of the Petition Date, the Debtor is current with obligations for the Employee Benefit Plans. The Debtor believes that it owes only *de minimis* amounts, if any, on account of outstanding accrued and unpaid prepetition obligations for Employee Benefit Plans.

52.     Overall, Treetop believes that the aggregate amount of all outstanding Employee Obligations, as of the Petition Date, is approximately $56,000.

## V.     The Debtors' Cash Management System

### A.     *Domestic Operations and Tellus Operating Group*

53.     In its capacity as Operator under the Operating Agreements, TOG receives proceeds from oil and gas production, which are deposited initially into a deposit account at Regions Bank in TOG's name (the "Revenue Account").

54.     From the Revenue Account, TOG makes various payments primarily to non-Debtor entities, including (a) severance taxes to the Mississippi Department of Revenue, (b) various fees to the Mississippi Oil and Gas Board, (c) payments to various owners of mineral rights, and (d) production proceeds to third-party, non-Debtor Working Interest Owners.

55.     In addition to the foregoing payments to non-Debtor entities, TOG also makes payments from the Revenue Account to Debtor BGGCO, LLC for gas-gathering and compression fees. These fees are charged to owners of nonparticipating royalty interests ("Royalty Interest Owners") as well as to Working Interest Owners, so the most efficient way to allocate these fees among Royalty Interest Owners is to deduct them from revenues.

56.     On a monthly basis, TOG estimates the amount of monthly production proceeds that is attributable to Working Interests owned by the Upstream Debtors, and transfers that amount into a deposit account at Regions Bank in TOG's name (the "Lien Account"). The Lien Account is only used to hold funds reasonably estimated to be owed to and owned by the Debtors, and no third-party or non-Debtor funds are held in the Lien Account. Therefore, while the Lien Account is nominally an account of TOG, all of the funds in the Lien Account are funds of the Debtors' estates and therefore subject to the automatic stay as set forth in section 362(a)(3) of the Bankruptcy Code. PanAm maintains a security agreement that purports to have a lien on the Lien Account.

57.     Under TOG's Services Agreement with the Debtors, TOG accounts for all funds of the Debtors in the Lien Account using a due-to/due-from ("DTDF") accounting system. Thus, although funds owned by one or more Debtors are physically commingled in the Lien Account, every penny is accounted for, traceable, and allocable as among each of the Debtors. The use of the DTDF system generally results in intercompany receivables and payables owing between one Debtor and another Debtor, or between TOG and a Debtor (collectively, the "Intercompany

Claims"). TOG and the Debtors have maintained the DTDF accounting system for more than 15 years, and it has been reviewed numerous times by third-party auditors as part of ordinary-course audits.

58.    To the extent the Upstream Debtors are obligated under the Operating Agreements to make payments to TOG for JIBs, COPAS fees, or cash calls, those items are recorded in the DTDF account, and the corresponding funds (if available) are transferred from the Lien Account into another deposit account at Regions Bank in TOG's name (the "TOG Operating Account").

59.    The funds in the TOG Operating Account generally are funds owned entirely by TOG, although at certain times, to maximize efficiency, the TOG Operating Account may temporarily contain Debtor funds that TOG will use to satisfy near-term Debtor obligations.

60.    If the Upstream Debtors have remaining net production proceeds in the Lien Account after the payments described above, TOG transfers the net proceeds to a Regions Bank account in the name of Tenrgys, LLC (the "Tenrgys Operating Account") as appropriate.

61.    The Midstream Debtors typically bill TOG, as operator of the various fields where these services are provided, and TOG remits payments directly to the Midstream Debtors by depositing them into one or more of the following accounts, as appropriate:

- Regions Bank account in the name of Treetop Midstream Services, LLC (the "Treetop Operating Account");

- Regions Bank account in the name of BGGCO, LLC (the "BGGCO Operating Account"); and

- Regions Bank account in the name of Greenleaf CO2 Solutions, LLC (the "Greenleaf Operating Account").

62.    The Upstream Debtors' share of the midstream services expenses is accounted by TOG in the same manner as described above, via the DTDF account.

63. Treetop's third-party payroll administrator, ADP TotalSource, debits the Treetop Operating Account for payment to the Employees.

64. The Real Estate Debtors own land, timber, and field office facilities in the fields that TOG operates for the Upstream Debtors and other non-affiliated Working Interest Owners. The Real Estate Debtors lease these real estate interests to TOG for use in its capacity as operator. In some instances, land owned by the Real Estate Debtors has been used as wetlands mitigation when required, in which case the Real Estate Debtors charge TOG for such use.

65. To the extent the Real Estate Debtors bill TOG for the lease or use of their real estate interests, TOG allocates those charges solely among non-affiliated, non-Debtor Working Interest Owners through the JIB process. In other words, all of the revenue generated by the Real Estate Debtors comes solely from non-Debtor entities and does not result in any costs or DTDF entries against any of the Debtors.

66. Some of the Debtors have subsidiaries that are not Debtors in these Chapter 11 cases, but that nevertheless are important parts of the Debtors' business. For example:

    a. Tellus Energy owns 100% of the interests of Telpico, LLC, which operates a branch named Telpico Colombia, LLC in the Republic of Colombia ("Colombia"). Telpico, LLC and Telpico Colombia, LLC (together, "Telpico") hold interests in three valuable oil-and-gas concessions in Colombia; and

    b. Treetop owns 65% of the stock of Bluetick, Inc. ("Bluetick"), which provides oilfield automation, monitoring, and control systems that are used to maximize efficiency and safety in the operation of the Debtors' oil-and-gas producing properties.

67. In the ordinary course of business, intercompany transactions (the "Intercompany Transactions") are effectuated from time to time as needed, sometimes among Debtor entities,

and sometimes between a Debtor and a non-Debtor subsidiary such as Telpico or Bluetick. Examples of such Intercompany Transactions include the periodic satisfaction of DTDF liabilities and providing liquidity to a Debtor or a non-Debtor subsidiary.

68.     In general, these Intercompany Transactions do not result in intercompany receivables. Rather, an Intercompany Transaction from a Debtor to its subsidiary is accounted as a capital contribution, whereas an Intercompany Transaction from a Debtor to its parent is accounted as a capital distribution.

69.     All such Intercompany Transactions are documented and recorded in the Debtors' books and records, which TOG and the Debtors maintain.

### B.     The JPMorgan Chase Bank Accounts

70.     As discussed above, Debtor Tellus Energy, LLC's non-Debtor subsidiary, Telpico, owns three valuable oil-and-gas concessions in Colombia, which are governed and regulated by the Colombian *Agencia Nacional de Hidrocarburos*, or National Hydrocarbons Agency (the "ANH").

71.     In connection with Telpico's Colombian assets and to guarantee Telpico's performance under two of its exploration and production contracts with the ANH, Telpico has two standby letters of credit in favor of the ANH (collectively, the "SLOCs"), which are issued by Banco Itaú Unibanco S.A. ("Banco Itaú"), a Brazilian bank that operates in Colombia.

72.     To secure the SLOCs, Tenrgys maintains a money market account (the "Chase MMA") at JPMorgan Chase Bank, N.A. ("Chase Bank"). Tenrgys also has a demand deposit account at Chase Bank (the "Chase Deposit Account"), which generally carries a *de minimis* balance merely to prevent the Chase Deposit Account from being closed. In the event the balance of the Chase MMA is required to be increased, Tenrgys transfers funds into the Chase Deposit Account and then immediately transfers those funds to the Chase MMA.

### C.      The Origin Bank Account

73.      Although TOG is the contract operator of nearly all of the oil-and-gas properties in which the Debtors own Working Interests, Debtor Tellus Energy, LLC is the operator of record for Fordoche Field located in Pointe Coupée Parish, Louisiana, and Montegut Field located in Terrebonne Parish, Louisiana. To satisfy Debtor Tellus Energy's requirement, as operator of record for these fields, to provide a financial responsibility bond, Origin Bank has issued a letter of credit for the benefit of the Louisiana Department of Natural Resources, Office of Conservation, of up to $250,000.00 (the "Origin LOC").

74.      Under the terms and conditions of the Origin LOC, Debtor Tellus Energy maintains an Origin Bank money market/savings account (the "Origin Collateral Account") with a balance of approximately $250,000.00 to secure Debtor Tellus Energy's Origin LOC obligations. The Origin Collateral Account is not used for any other purpose.

## VI.   Cash Collateral

75.      PanAm has alleged that the amount of its secured claim is approximately $70 Million (including principal and alleged default interest) as of June 30, 2021. PanAm holds security interests on substantially all of the assets of the Debtors, which include all of the Debtors' cash on hand as well as production revenues generated and held by TOG in its various accounts, including among others, the Lien Account.[1] The Debtors' use of "Cash Collateral" (as that term is defined in Section 363(a) of the Bankruptcy Code) is necessary to avoid immediate and irreparable harm to their estates. Specifically, without access to Cash Collateral, the Debtors would be forced to shut down production, lose access rights to leasehold interests, lose their Colombian concession rights, and suffer other value-destroying harms.

---

[1] For purposes of this Declaration only, the Debtors and I assume—but do not concede—that PanAm holds security interests on substantially all of the assets of the Debtors.

76.     As described in the preceding section, the Debtors and TOG use a cash management system to collect, transfer, and disburse efficiently the funds generated by the Debtors' business operations. Absent authorization from this Court to use the Cash Collateral, the Debtors will have to cease operations immediately and will be immediately and irreparably harmed as a result. The Debtors' ability to meet payroll and pay their ordinary-course operating expenses is essential to the Debtors' continued viability and the value of their business as a going concern.

77.     Currently, the Debtors lack sufficient unencumbered funds with which to operate their business on an ongoing basis. The Debtors, therefore, have an urgent and immediate need to use the Cash Collateral to continue to operate their business. Absent authorization from this Court to use the Cash Collateral, the Debtors will have to cease operations immediately and, as a result, will be immediately and irreparably harmed. The Debtors' ability to maintain business relationships with, among others, their customers and to meet payroll and other operating expenses is essential to the Debtors' continued viability and the value of their business as a going concern.

78.     The Debtors anticipate spending a limited amount of time in Chapter 11. But without the use of the Cash Collateral, the Debtors will not be able to continue operating their business, even for a limited period of time.

79.     Attached hereto as Exhibit "B" is a four-month cash-flow projection (the "Projection") setting forth the Debtors' anticipated use of Cash Collateral during these Chapter 11 cases.

80.     As shown in the Projection, the Debtors anticipate making disbursements to perform work required to maintain the Colombian Assets held by Telpico. The anticipated work includes costs for constructing an access road to the drilling location. This work must be

performed timely for Telpico to comply with milestones contained in Telpico's contracts with the ANH for block VSM 22.

81.     The Projection also includes general and administrative costs in Colombia, such as payroll, contractor expenses, and rent. Without this administrative presence in Colombia, the execution of the required work to maintain the Colombian Assets would be at risk.

82.     The total amount of disbursements included in the Debtors' Projection related to maintaining and preserving the value of the Colombian Assets is $1,291,237.00.

83.     For these reasons, the Debtors have determined, in the exercise of their sound business judgment, that they require the use of the Cash Collateral for the maintenance and preservation of their assets, the operation of their business, the payment of expenses attendant thereto, working capital and capital expenditures, purposes that include those set forth in the Projection, the payment of expenses otherwise authorized by this Court, and the costs and expenses of administering these Chapter 11 Cases.

84.     According to recent valuations of most of the Debtors' assets performed by FTI Consulting, Inc. and Moyes & Co., PanAm is vastly oversecured. Therefore, for that reason and as more fully explained in the *Debtors' Emergency Motion to Authorize Use of Cash Collateral, and to Schedule a Final Hearing*, the Debtors believe that PanAm's interest in the Cash Collateral is adequately protected by a substantial equity cushion.

**VII.    Capital Structure**

85.     The Debtors have approximately $129 Million of funded debt principal (plus accrued interest), under which Tenrgys is the primary borrower, and the other Debtors are guarantors.

### A.    The 2012 Secured Loan

86.    Tenrgys entered into a secured credit facility, the Second Amended and Restated Credit Agreement, dated as of August 30, 2012 (as may be amended and restated from time to time, the "2012 Secured Loan"), with Tenrgys as Borrower, Regions Bank as Administrative Agent and LC Issuer, Certain Financial Institutions as Lenders, Regions Capital Markets, a division of Regions Bank, as Sole Lead Arranger and Sole Book Runner, and Capital One, National Association, as Syndication Agent.

87.    The 2012 Secured Loan is a borrowing base revolving credit facility, under which Tenrgys had access to a $125 Million line of credit secured by the Debtors' oil and gas reserves.[2] Under the terms of the agreement, the Debtors' reserves were evaluated periodically, and the amount of credit available to Tenrgys was adjusted in accordance with the analysis of the value of the reserves. The borrowing base was subject to adjustment based upon (i) commodity prices and (ii) analysis of the Debtors' oil and gas reserves.

88.    The Debtors that owned mineral interests granted deeds of trust covering those mineral interests, and all of the Debtors executed guaranty agreements, as security for the 2012 Secured Loan. The 2012 Secured Loan is secured by substantially all of the assets of the Debtors, including Debtor Tellus Energy, LLC's 100% membership interest in its non-Debtor subsidiary Telpico, LLC.

89.    The Second Amended and Restated Credit Agreement dated August 30, 2102 has since been amended by (a) the First Amendment thereto dated December 21, 2012, (b) the Second Amendment thereto dated December 23, 2012, (c) the Third Amendment thereto dated May 21, 2015, (d) the Fourth Amendment thereto dated February 1, 2017, (e) the Fifth Amendment thereto

---

[2] The 2012 Secured Loan has matured so the line of credit is no longer available.

dated April 3, 2017, and (f) the Sixth Amendment thereto dated August 30, 2017. PanAm has alleged that the amount of its secured claim owed pursuant to the 2012 Secured Loan is approximately $70 million as of June 30, 2021.

### B.    The 2013 Unsecured Term Loan

90.    Tenrgys entered into a Term Loan Agreement (the "2013 Term Loan Agreement") dated as of December 23, 2013, with Tenrgys as Borrower, Wilmington Trust, National Association, as Administrative Agent, FS Energy and Power Fund as Lead Lender, and Certain Financial Institutions as Lenders ("2013 Term Loan"). The original principal amount of the 2013 Term Loan was $75 Million. The 2013 Term Loan is unsecured. The Debtors other than Tenrgys executed guaranty agreements in support of the loan.

91.    On July 5, 2017, FS Energy and Power Fund sold and assigned 48.216666667% of the 2013 Term Loan to Foxfields Funding LLC. On May 29, 2019, each of FS Energy and Power Fund and Foxfields Funding LLC sold and assigned its entire interest in the 2013 Term Loan to FSEP Investments, Inc. From May 29, 2019 forward, FSEP Investments, Inc. has owned all interest in the 2013 Term Loan. The amount of FSEP Investments, Inc.'s claim owed pursuant to the 2013 Term Loan is approximately $75 million in aggregate principal amount plus all interest, past due and default interest, fees, expenses and charges arising under the terms and conditions of the 2013 Term Loan and the 2013 Term Loan Agreement and/or any guaranties related to the 2013 Term Loan and the 2013 Term Loan Agreement.

## VIII.   Events Leading to Bankruptcy

### A.    Collapse of Oil Prices in 2014 and 2015

92.    Tenrgys borrowed money under the 2012 Secured Loan and the 2013 Term Loan to finance capital expenditures for the growth of the Debtors' business. The Debtors successfully grew, developed, and operated their business until commodity prices fell precipitously in late

2014 and early 2015. The price of crude oil was over $90 per barrel for most of the latter part of 2012, and $100 per barrel in June 2014.[3] By the end of 2014, prices had fallen to below $50 per barrel. Over a year later, in January 2016, prices had fallen to $30 per barrel.

93.    The drastic decline in oil prices negatively affected the value of Tenrgys' oil and gas reserves. As a result, when the determination of borrowing base under the 2012 Secured Loan was made in 2015, the lender reduced the borrowing base. The reduction in borrowing base triggered a mandatory prepayment requirement, under which Tenrgys was obligated to pay principal sufficient to eliminate the borrowing-base deficiency. Despite its best efforts, Tenrgys was not able to do so.

94.    During this time period, the Debtors made significant capital expenditures to develop infrastructure under an agreement that would have allowed them to purchase $CO_2$ from Mississippi Power Company for use in tertiary recovery projects. Mississippi Power Company never completed the coal gasification power plant, so the anticipated source of $CO_2$ for enhanced oil recovery never materialized, negatively impacting planned production and cash flow growth.

### B.    *Divestitures of Assets in 2016 and 2017*

95.    Working cooperatively with their lenders, the Debtors initiated a series of actions to reduce the indebtedness under the 2012 Secured Loan, including divesting certain assets and using the proceeds of the sales to pay down indebtedness.

(a)    In March 2016, Telpico sold a 20% interest in the one of its prospects in Colombia for $9 Million.

(b)    In May 2016, one of Tenrgys' subsidiaries sold the office building in which the Debtors maintain offices for a purchase price of $3.75 Million and entered into an agreement to lease the building from the purchaser.

---

[3] Prices are West Texas Intermediate ("WTI") crude prices, a benchmark price regularly used to report crude oil prices. Actual prices in the field may vary from WTI, but the trends shown in WTI prices generally reflect trends of prices paid for crude in the field.

(c)     In June 2016, the Debtors sold producing assets in Louisiana for a purchase price of $14.7 Million.

(d)     In March of 2017, the Debtors sold half of the West Yellow Creek Field for $16 Million, and negotiated lucrative $CO_2$ transportation and pumping, and $CO_2$ recycling fees for use of Treetop's midstream $CO_2$ infrastructure.

(e)     In July 2017, the Debtors sold the North Hiwannee Field in Mississippi for a purchase price of $37.5 Million.

(f)     In early June 2017, the Debtors sold a number of smaller, non-strategic producing properties in Mississippi for a purchase price of $6.1 Million.

96.     The sales of assets described above allowed the Debtors to reduce the indebtedness under the 2012 Secured Loan substantially. In just over a year, the outstanding principal balance had been reduced from approximately $110 Million to approximately $53 Million. Encouraged by this reduction in indebtedness, the Debtors' lenders did not foreclose, but continued to work with the Debtors.

### C.     Loss of the Sale of Baxterville Field in 2017

97.     The anticipated final step in the sequence of divestitures was to be the sale of the Debtors' interests in the Baxterville Field in southern Mississippi. Several prospective buyers expressed interest in the Baxterville Field, and as of June 2017, Tenrgys had an offer from an able purchaser to purchase the Baxterville Field assets for $41 Million. This sale would have allowed the Debtors to pay a substantial amount of the outstanding indebtedness under the 2012 Secured Loan. Regions Bank, the lead lender in the bank syndicate, knew about and concurred in the plan to sell the Baxterville Field and pay down the 2012 Secured Loan to about $12 Million. Regions represented to me that, if Tenrgys sold Baxterville Field and used those proceeds to pay down the 2012 Secured Loan, Regions would provide us with a new reserve-based loan of $20 Million to $25 Million that could be used, in part, to pay off the rest of the 2012 Secured Loan.

98.     In addition to being the lead lender in the 2012 Secured Loan, Regions Bank held and continues to hold operating accounts for the Debtors. In June 2017, Regions wrongfully dishonored a check issued by Debtor SNPI, LLC to the largest mineral owner lessor in the Baxterville Field, whose lease accounts for approximately 50% of SNPI's total leasehold in the Baxterville Field. Though the dishonoring of the check was wrongful (as Regions admits), the mineral owner used the occasion to assert that SNPI had breached its lease agreement by failing to pay the annual lease payment, and that, as a result, the lease was terminated. The cloud on this lease caused by the mineral owners' claim made it impossible to close a sale of the Baxterville Field assets.

99.     Without the $41 Million from the sale of the Baxterville assets, Tenrgys could not execute its plan of paying off the 2012 Secured Loan and entering into a new loan agreement with Regions. On November 10, 2017, the lenders under the 2012 Secured Loan delivered notice of default to Tenrgys.

100.    In anticipation of the sale of the Baxterville Field, Tenrgys had negotiated with GSO Capital Partners, LP, the advisor to the lenders under the 2013 Term Loan, an agreement to restructure the Debtors' indebtedness under the 2013 Term Loan. When the sale of Baxterville fell through, so did the restructuring of the 2013 Term Loan.

101.    In 2018, FS/EIG Advisor, LLC (together with its advised lender affiliates, "EIG") replaced GSO Capital Partners, LP as advisor to FS Energy and Foxfields Fundings LLC under the 2013 Term Loan. Tenrgys worked diligently to negotiate restructuring terms with EIG and with the 2012 Secured Loan lenders. However, on January 18, 2019, EIG delivered to Tenrgys a notice of default under the 2013 Term Loan.

102.    During 2018, Tenrgys also undertook extensive efforts to identity alternative sources of financing. By May 2018, two private equity funds had made offers to refinance all or

part of the 2012 Secured Loan. Later in January 2019, one of the private equity funds entered into negotiations with Tenrgys to participate as a stalking horse in bankruptcy proceedings if that became necessary.

### D.    PanAm's Initial Involvement in 2019

103.    Telpico holds a 100% interest in, and operating control of, three Colombian oil and gas contracts (blocks, contracts, or concessions) that cover geographic areas referred to as LLA 42, VSM 22, and VSM 3, covering more than 260,000 acres. These three contracts are granted, governed and regulated by the Colombian national government regulator, "ANH," and are owned by Telpico. Telpico's assets, including its contractual rights and interests concerning blocks Llanos 42, VSM 22, and VSM 3, are the "Colombian Assets" referred to above.

104.    Telpico has acquired extensive three-dimensional (3D) seismic and surveys on the LLA42 and VSM22 blocks contract areas, and two-dimensional (2D) seismic on the VSM 3 block, and processing and interpreting the related seismic data indicates that very large oil accumulations exist for drilling. As of early 2019, LLA42 and VSM22 were ready for drilling. As of January 2019, over $90 Million had been invested, and several years of extensive time-consuming work had been expended, on analyzing, permitting, socializing, and preparing the LLA 42, VSM 22, and VSM 3 prospect wells for drilling.

105.    In January 2019, ▮▮▮▮▮▮▮ ("▮▮▮▮▮▮"), the majority owner, chairman and CEO of ▮▮▮▮▮▮▮▮▮▮▮, learned about the Colombian Assets through a personal associate and approached Tenrgys about investing with Tenrgys in the development of the Colombian Assets. On February 19, 2019, TOG personnel and I met with ▮▮▮▮▮ and his advisors to discuss ▮▮▮▮▮'s investment in Tenrgys. Among the matters discussed at that meeting was Tenrgys' need to file chapter 11 proceedings due to its matured obligations under the 2012 Secured Loan and the 2013 Term Loan. We did not spend much time talking about the

Colombian Assets at that meeting because ████ said that he was comfortable with what he had already learned about the Colombian Assets and was comfortable with an investment. On March 6, 2019, members of ████'s team traveled to Mississippi to begin due diligence.

106.   I mentioned above that during the early months of 2019, Tenrgys had entered negotiations with a private equity group about options to refinance Tenrgys' debt. Though the initial agreement with the private equity group had excluded the Colombian Assets, in March 2019, the private equity group unexpectedly demanded that the Colombian Assets be included in the collateral securing any loan that group might make.

107.   Because Tenrgys had already engaged in discussions with ████ about investing in the Colombian Assets, Tenrgys was concerned that agreeing to the private equity group's proposal could derail the discussions with ████ and leave Telpico unable to fund the necessary exploration and development costs in Colombia. For his part, ████ did not want to risk the loss of the Colombian Assets in a restructuring, whether that occurred out of court or through chapter 11 proceedings.

### E.   Letter of Understanding in April 2019

108.   ████ formed PanAm19 Holdings, LLC ("PanAm") in March 2019 as the entity through which he would make his investment in Tenrgys and the Colombia Assets. On April 2, 2019, Tenrgys and PanAm entered into a Letter of Understanding (the "April LOU") setting out the terms under which the parties would work to enter into agreements that would include the following terms:

(a)   PanAm would buy the secured debt under the 2012 Secured Loan, which was approximately $50 Million at the time, and advance Tenrgys $5 Million to meet immediate liquidity needs.

(b)   PanAm and Tenrgys would determine the optimum capital structure of Tenrgys, and PanAm would convert all or part of the $50 Million secured debt to equity, enabling Tenrgys to secure a commercial bank loan of $15 Million.

      (c)     Tenrgys would use the new commercial loan to repay PanAm's $5 Million advance and fund future working capital needs.

      (d)     PanAm's debt converted to equity would be eligible to be run through a "waterfall structure," under which TOG would be able to earn additional compensation up to 50% of the cash flow of Tenrgys as PanAm achieved certain return on investment milestones.

      (e)     If Tenrgys was not able to restructure the 2013 Term Loan debt, it would consider filing for protection and reorganization under Chapter 11.

      (f)     TOG would remain operator of Tenrgys' domestic oil and gas fields.

      (g)     The Colombian Assets would be addressed in a separate agreement to be negotiated.

      (h)     Transaction documents would be drafted.

109.    On April 8, 2019, shortly after signing the Letter of Understanding, PanAm purchased the interests of the banks under the 2012 Secured Loan and became Tenrgys' secured creditor under the 2012 Secured Loan. The price of oil and natural gas has increased considerably since that time and, as a result, the value of PanAm's collateral has increased.

### F.  Letter of Intent in September 2019

110.    In the following months, Tenrgys and PanAm worked with EIG to restructure the 2013 Term Loan debt. An agreement with EIG was reached in mid-June 2019.

111.    In August 2019, PanAm informed Tenrgys and EIG that it had decided to convert only $10 Million of its $55 Million of the 2012 Secured Loan to equity.

112.    On September 16, 2019, EIG, PanAm, and Tenrgys executed a Letter of Intent ("September 2019 LOI") providing the following:

      (a)     EIG would be paid $5 Million in cash and have a new $15.5 Million unsecured term note payable in increments at the end of year 3, year 4, and year 5, with a 6% cash and 8% PIK feature.

      (b)     EIG would convert the remainder of its debt ($55 Million principal plus accrued interest) to a 5% equity interest in Tenrgys.

      (c)     PanAm would convert $10 Million of its first lien debt into equity in Tenrgys.

(d)     Tenrgys would seek a new $20 Million reserve-base loan to pay the $5 Million cash payment to EIG, and $5 Million advance from PanAm, and use the remaining $10 Million to fund Tenrgys' ongoing working capital needs.

113.     The restructuring contemplated in the September 2019 LOI was contingent upon Tenrgys obtaining new financing. However, even with the restructuring of the unsecured debt, and contrary to Tenrgys and the unsecured lender's suggestions to PanAm that PanAm would need to convert substantially more debt to equity in order for Tenrgys to obtain commercial bank financing, PanAm's decision to convert only $10 Million of the 2012 Secured Loan left Tenrgys with a total outstanding principal indebtedness of $65 Million. Under recently promulgated banking regulations, which were known to all parties, Tenrgys' leverage at that debt level precluded a commercial bank loan. Two months after signing the Letter of Intent, despite diligent search, Tenrgys had exhausted all avenues for commercial reserve-base financing.

114.     In mid-November 2019, PanAm informed me that it would not agree to convert more than $10 Million of the 2012 Secured Loan to equity, and would no longer help Tenrgys obtain a new working capital loan.

115.     In late November, PanAm informed me that it would go forward only if Tenrgys' management agreed to make personal loans in the amount of $3 Million to fund working capital needs. We were also told that certain persons associated with PanAm would make a $3 Million loan.

### G.     PanAm Changes the Terms of the Colombian Assets

116.     As noted, the April LOU excluded the Colombia Assets at PanAm's request, stating that assets outside the United States were better addressed in a separate agreement. The parties had agreed that PanAm and Tenrgys would own seventy percent (70%) and thirty percent (30%) in the Colombian Assets, respectively. However, in December 2019, PanAm informed Tenrgys that it would take its Colombia ownership under a "Farm Out Agreement" or "Farm

Out" and fund only its share of the future expense of developing the Colombia Assets. PanAm further informed Tenrgys that it would own eighty-five percent (85%) of the Colombia Assets rather than the seventy percent (70%) which had originally been agreed to. PanAm's additional fifteen percent (15%) ownership in the Colombia Assets was to come through a half ownership of Telpico's 30%. As a result, Tenrgys effectively would have been left with a 15% interest. PanAm further demanded that the 5% equity interest EIG was to receive in Tenrgys be taken only from Tenrgys' interest, which would have left Tenrgys with only 10% financial interest in the Colombian Assets.

117.     Due to PanAm's decision to take its ownership of the Colombia Assets through a Farm Out, several entirely new documents were required to be drafted; initially a Farmout Agreement, Joint Operating Agreement, Accounting Procedure, and a two-year Work Program and Budget. PanAm's subsequent retrades of these initial documents later required that a Promissory Note be drafted as well. Funding for the Colombia Assets was initially never envisioned to come from anywhere but Tenrgys' cash flow, up until PanAm's Farm Out demands. Timely working capital sourced from a commercial loan, or later in 2019 from Tenrgys' management pursuant to its agreement, was to be Tenrgys' source of working capital, and working capital invested in Tenrgys' domestic projects would have elevated production and revenues allowing Tenrgys to fund the Colombia Assets. PanAm's, Tenrgys', and EIG's ownership in the Colombia Assets was aligned. PanAm's demand to take ownership in the Colombia Assets as a Farm Out unaligned PanAm's interests from Tenrgys' and EIG's interests in the Colombia Assets.

118.     PanAm's demand to take its Colombia Assets in the form of a Farm Out from Tenrgys and fund it separately raised several issues, the most important of which was Telpico's ability to fund its 15% minority share.

119.    With PanAm's full knowledge—indeed, at PanAm's *insistence*—Tenrgys was required to continue to invest in the Colombian Assets, spending precious cash flow for nearly two and a half years to acquire surface rights for access road, obtain permits, resolve environmental matters, continue socialization activities in each block, and most importantly, work with the ANH to extend the contract expiration dates. Despite PanAm's demand to take its ownership in the Colombia Assets in the form of a Farm Out, PanAm has repeatedly refused to pay its share of Colombia costs.

120.    Prospect wells for both VSM 22 and LLA 42 could have and would have been drilled in 2019, 2020, or in 2021. But for the lack of PanAm's funding, the LLA 42 and VSM 22 wells would have been drilled, negating the need to obtain costly and time-consuming extensions of these contracts beyond mid-2020, and again beyond mid-2021.

121.    Overall, in 2019 and 2020, the Debtors spent approximately $5.5 Million maintaining and improving the Colombian Assets and preparing the prospect wells to be drilled. The Debtors have also incurred substantial costs revising the Colombia Documents due to successive retrading by PanAm.

122.    The money PanAm directed Tenrgys to spend on the Colombia Assets, reduced the money available to the Debtors for domestic development, resulting in, among other things, a reduction in purchases of $CO_2$ for the Debtors' tertiary recovery projects. The resultant reduction in $CO_2$ available for injection in its domestic fields prevented the full development of the Debtors' tertiary recovery projects.

### H.    PanAm Aborts a Scheduled Closing in January 2021

123.    After many months of negotiations and working on documents, it appeared that the Debtors, PanAm, and EIG had reached agreement and were prepared to close in late January 2021. Though the terms of the deal had evolved since the April LOU and subsequent September

LOI, Tenrgys was agreeable in order to avoid being forced into bankruptcy by PanAm. Drafts of documents circulated for closing in late January included (a) an amendment to the Tenrgys LLC Agreement to address the contemplated new membership interests, (b) loan documents governing PanAm's secured loan, EIG's unsecured loan, and the working capital loan from Tenrgys management team, and (c) documents governing the Colombian Assets.

124.    The January 2021 closing documents provided the following:

(a)    PanAm would convert $10 Million of its debt to equity at closing, and the balance of $45 Million would remain as first lien debt subject to a new term loan agreement. PanAm also structured an option to convert more of its $45 Million debt to equity, as frequently as monthly. All amounts of debt PanAm converted to equity would flow through the Waterfall described above for an enhanced return on investment.

(b)    The PanAm membership interest would have 51% of voting rights; the current Tenrgys membership interest 49%.

(c)    A "Waterfall" structure would be in place, under which PanAm would receive a significantly higher portion of the distributions of the Company until it had realized a substantial return on its debt converted to equity. At the beginning, PanAm would receive 90% of distributions. As its return on investments increased, its proportionate share of investments would decrease. Finally, when PanAm's return on investment reached 2.0, it would receive 50% of distributions.

(d)    The maximum amount that PanAm could convert and use as the basis for the Waterfall was $55 Million. In effect, that meant that all the principal, but not the interest owed under the secured loan, could become the basis for the Waterfall.

(e)    Both the composition and the power of the Board of Directors would change. The Board of Directors would consist of five members – the Manager, one Manager appointee, and three PanAm appointees.

(f)    The Board of Directors would have sole discretion regarding the amount and timing of Distributions other than Telpico Distributions. Since PanAm would control the Board of Directors, this meant that PanAm would effectively control Distributions, including Tax Distributions.

(g)    The procedure by which the Initial Manager could be removed would change. Rather than removal by the membership for a very limited number of causes (generally conviction of a felony), the Manager could be removed by a majority of the membership interest after determination by Board of Directors that the Manager had failed to perform his duties or had willfully failed, without

reasonable justification, to comply with a reasonable written order of the Board of Directors.

(h)  The Manager would continue to have sole authority to manage the day-to-day activities of the Company in the ordinary course.

(i)  Board of Director approval would be required for a limited number of Manager actions: incurrence of indebtedness, capital expenditures greater than $500,000, and certain indemnification matters.

(j)  If the Manager sought indemnification, his eligibility would be determined by a committee of three, consisting of one member appointed by PanAm and two Class A members.

(k)  PanAm would have a right of first refusal if EIG decided to sell its membership interest.

(l)  PanAm's first lien loan would be at a 6% interest rate; interest due and payable annually. Earlier versions of the PanAm loan agreement included an option to pay interest in kind rather than pay it annually. However, by the time of this January 24 draft, PanAm had disallowed the same PIK feature EIG was allowing and required annual 6% cash payments of interest. The loan would have a 4-year maturity.

(m)  Working capital advances would be available upon Tenrgys' request and PanAm's approval, with 20% of approved amount provided by Tenrgys' management team under a working capital loan and 80% by PanAm.

(n)  Under the loan documents, the only permitted distributions while indebtedness remained under the loans were tax distributions.

(o)  EIG would receive a cash payment of $500,000 at closing and a $20 Million unsecured term loan with 6% interest if paid in cash, 8% if paid in kind, and a 5-year maturity.

(p)  EIG would convert the remainder of its debt ($55 Million principal plus accrued interest) to a 5% equity interest in Tenrgys. It would have financial rights, but no governance rights.

(q)  PanAm would take 85% ownership of the Colombia Assets in the form of a Farm Out. PanAm was to fund its 85% share of the Colombia costs, and fund Telpico's 15% share in the form of a loan to Tenrgys.

125.  The restructuring did not close in January 2021. Just before closing was scheduled to occur, PanAm introduced new and significant changes to the Colombia documents, causing further extensive negotiation.

126.    Drilling the prospect wells for blocks VSM 22 and LLA 42 was scheduled to occur in the spring of 2021. All necessary materials had been provided to PanAm for funding the LLA 42 prospect well. PanAm went so far as to demand that Telpico enter into contracts with service providers and proceed to drill the LLA 42 prospect well, but not provide Tenrgys with the necessary funding to do so. Tenrgys resisted PanAm's demands to spend funds it did not have.

127.    But for PanAm's last-minute retrade of the Colombia Asset related documents, LLA 42 and VSM 22 could have and would have been drilled in the spring of 2021. Due to PanAm's actions, Tenrgys has been forced to apply for extensions from the ANH for VSM 22 and LLA 42 into 2022.

128.    Moreover, later in April 2021, PanAm began making further changes to the loan agreement and the terms of the amendment to the LLC Agreement. Though the deal was becoming more difficult to accept, once again Tenrgys and EIG agreed to several of PanAm's demands in an effort to get an out-of-court restructuring completed and avoid bankruptcy.

## I.    *PanAm Aborts Another Scheduled Closing in June 2021*

129.    After months of negotiations, the parties were again set to close on June 25, 2021. In fact, it appeared that all parties had agreed on final versions of the documents. There were changes from the January 2021 loan documents, summarized below.

(a)    On June 24, the day prior to the scheduled closing, PanAm added $5 Million of default interest to the amount initially converted to equity, thereby increasing the total conversion that could be the basis for the waterfall and subject to the return on investment threshold from $55 Million to $60 Million.

(b)    The interest on PanAm's loan would be compounded quarterly rather than calculated as simple interest.

(c)    $5 Million of the $45 Million of the 2012 Secured Loan and all future working capital advances would be reclassified as working capital subject to a three year maturity, rather than a four year maturity.

(d)     Rather than the previously agreed 20% Tenrgys management/80% PanAm funding of working capital advances, Tenrgys management would have to provide a minimum of 20% of approved amount and PanAm would provide a maximum of 80%. In effect, PanAm had no requirement to fund any advances, even if the Company's management team lenders provided funds.

(e)     Distributions would be permitted if free cash flow in any one year was greater than $1.5 Million, rather than the previous requirement that no distributions be made until the loans were satisfied.

130.    Unfortunately, the closing scheduled for June 25, 2021 again did not occur because of actions taken by PanAm, which were similar to those taken in January 2021.

**J.      PanAm's Proposed Certificate of Designation**

131.    Before the June 25, 2021 closing, Tenrgys and EIG had each agreed to the terms within all of the closing documents, but the day of the scheduled closing, PanAm pulled their support of the transaction and would not consent to closing. Soon thereafter, PanAm began pushing for further changes to the LLC Amendment. On July 13 2021, PanAm delivered a proposed Certificate of Designation, a document by which I, as Manager, could supposedly create new classes of membership interest, designate their rights and powers, establish the waterfall mentioned above, and make far reaching changes in the governance of the Company, all by simple declaration, without a vote of the membership interest. As explained above, I have the authority as Manager to create new classes of membership interest. However, the changes that PanAm demanded involved more than simply creating new classes of membership interest. For example, PanAm's first and second drafts of the Certificate of Designation initially gave PanAm ninety percent (90%) of the membership interest voting rights, which would have provided PanAm the right to amend the LLC Agreement immediately upon signing it. Additionally, along with their specific demands, for months PanAm has tried to persuade Tenrgys that all the changes PanAm wanted could be effected by the Manager without the vote of the members. The

Certificate of Designation was apparently an attempt to circumvent a member vote by renaming an amendment to the LLC Agreement as a Certificate of Designation.

132.    Even still, following the failed June 25, 2021 closing, the Company continued to negotiate with PanAm for several more weeks. Unfortunately, yet again, such negotiations yielded very few changes to PanAm's demands. PanAm's last Certificate of Designation proposal would have provided for the following changes to the LLC Agreement:

(a)    PanAm's membership interest would be "senior in right in substantially all respects" to the rights of the Tenrgys' and EIG's membership interests.

(b)    PanAm's voting rights would reflect its financial rights, so that at the beginning, PanAm would have 90% of the voting rights in the Company. PanAm's voting right would decrease as its return on investment increases, until its voting right settled at 51%. This is a significant change from the June draft which gave PanAm 51% of the voting rights without regard to its financial rights.

(c)    Since for most matters on which members vote under the LLC Agreement a 67% vote is required for an act of the members, the above described voting rights would give PanAm the power to act with unilateral authority until it has earned a substantial return on its investment and its vote had decreased under the waterfall. This change would allow PanAm to sell assets, merge the Company, dissolve the Company, and take other actions without the approval of the Class A membership (the current Tenrgys membership). The only exception to the unilateral power that PanAm agreed to was that the LLC Agreement could not be amended without the consent of the Class A membership.

(d)    Consistent with the demand made when the deal did not close June 25, 2021, the Certificate of Designation would increase the amount that can flow through the waterfall from $55 Million to $60 Million. Since the waterfall provides a 2.0 return on investment for PanAm, this change increases PanAm's potential payment through the waterfall by $10 Million.

(e)    PanAm would have exclusive approval rights for all distributions, including tax distributions, Telpico distributions, and waterfall distributions. Even though under previous drafts the Board of Directors, which would have been controlled by PanAm, determined distributions, Tenrgys would have had two of the five Board of Director seats and had some say with respect to distributions. Under the Certificate of Designation, PanAm alone controls distributions.

(f)    As Manager, I would report to the Board of Directors or to an executive committee appointed by the Board. In either case, I would effectively be reporting to PanAm.

(g)     The Manager's ability to make capital expenditures or enter into contracts would be reduced to $200,000.

(h)     The Board would have broader authority to remove me as Manager, and the committee which determines whether the Manager has met the criteria for indemnification would be controlled by PanAm.

## IX.     Restructuring Support Agreement with EIG

133.     As Manager, I was faced with two significant problems as a result of the Certificate Designation. First, I became less comfortable that PanAm's proposed deal was in the best interest of Tenrgys and its members. Second, I knew that I did not have the authority under the LLC Agreement to make the sweeping changes set out in the Certificate of Designation without a vote of the Tenrgys members. Because I did not have this authority, Tenrgys' management team began to prepare for a member vote. Aware that the members might not approve the deal proposed by PanAm, and in light of the ongoing difficulties negotiating with PanAm, Tenrgys also began to consider the possibility that it would need to seek the protections of chapter 11 bankruptcy proceedings.

134.     With the possibility of a bankruptcy filing on the horizon, on July 15, 2021, Tenrgys engaged FTI Consulting, Inc., a well-known consulting firm with extensive experience in reorganizations, to analyze the Debtors' assets and business operations and to prepare financial projections.

135.     Tenrgys and EIG discussed the possible need to file bankruptcy. Cognizant that a forced liquidation of the Debtors would likely result in creditors receiving less than they would in a chapter 11 reorganization proceeding, EIG agreed to reengage in negotiations with Tenrgys about a possible restructuring. However, on August 13, 2021, Tenrgys received a demand letter from PanAm that demanded payment on the 2012 Secured Loan within three days. Being unable to meet this demand, the Company and EIG used August 2021 to negotiate the terms of a

Restructuring Support and Lock-Up Agreement (the "RSA"). The RSA was executed on September 16, 2021. In short, the RSA provides that EIG will support the Debtors' chapter 11 plan of reorganization pursuant to the terms and conditions in the RSA. The high-level terms of the RSA are highlighted below.

## X.  Joint Plan of Reorganization

136.    As discussed above, the Debtors would like to spend a very limited time in these Chapter 11 Cases, so as to minimize administrative expenses and preserve the maximum value of the estates for the benefit of all stakeholders. To that end, the Debtors intend to file a disclosure statement and joint plan of reorganization as quickly as possible, and in any event within the first fourteen days of these Chapter 11 Cases, proposing: (a) the satisfaction of the alleged secured claim of PanAm through the Colombian Collateral Tender Transaction, as described below; (b) the partial equitization and restructuring of EIG's unsecured claim, as described below; (c) the payment of any remaining general unsecured claims in full in cash at confirmation; and (d) Exit Financing, as described below, of up to $5 Million on the Effective Date to ensure liquidity and assist in commencing payments under the Plan.

### A.    *Colombian Collateral Tender Transaction*

137.    PanAm's collateral under the 2012 Secured Loan includes a security interest in 100% of the LLC membership interests of Telpico, which owns the Colombian Assets. Telpico and its former partners have spent over $90 Million acquiring, processing, and interpreting seismic surveys, conducting geologic reviews, preparing environmental studies, obtaining environmental, drilling, and other permits, socializing the blocks, soliciting contract bids from third party service providers to drill, complete, and produce prospect wells, filing periodic administrative requirements with Colombian government agencies, and routinely obtaining extensions of the Colombian Assets from the ANH. The Colombian Assets are now "drill ready."

138.    PanAm has alleged that the amount of its secured claim is approximately $55 Million plus any accrued interest as of June 30, 2021.

139.    Moyes & Co. has valued the Colombian Assets between approximately $97.2 Million and $121.2 Million as of August 1, 2021. Additionally, PanAm, on its own volition, initiated a geologic and engineering evaluation of the Colombian Assets. That assessment assigns value to Telpico's interest in the Colombian Assets that is significantly higher than the amount of PanAm's secured claim, and higher than the opinion of value expressed by Moyes & Co.

140.    The Debtors will propose in the Plan to convey to PanAm all of the Debtors' right, title, and interest in and to Telpico and the Colombian Assets on the effective date in full and complete satisfaction of PanAm's secured claim (the "Colombian Collateral Tender Transaction").

141.    ████████ approached Tenrgys in the first place because of his interest in the Colombian Assets, and PanAm purchased the 2012 Secured Loan for the specific purpose of obtaining an interest in the Colombian Assets. PanAm has made it clear that it intends to drill the Colombian Assets and, pursuant to the Farm Out Agreement, pay at least 85% of the costs to do so. Telpico and its former partners have already put more than $90 Million into the Colombian Assets to make them "drill ready," and Moyes has valued the Telpico's interest in the Colombian Assets *at least* $97.2 million. Therefore, I believe that conveying Telpico and the Colombian Assets to PanAm will enable PanAm to realize the indubitable equivalent of its alleged secured claim of approximately $70 million, as contemplated by Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

### B.    *Treatment of EIG's 2013 Term Loan Claim*

142.    The Debtors will propose in the Plan to treat EIG's allowed claim by conveying to EIG:

    (a)      Payment of the sum of Five Hundred Thousand Dollars ($500,000.00) in cash on the plan effective date;

    (b)      A membership interest equal to ten percent (10.00%) of the equity in the reorganized Tenrgys; and

    (c)      a new $40 million floating rate first-lien term loan with market pricing (but with an interest rate of L+650 with a LIBOR floor of 1% if paid in cash, or L+850 with a LIBOR floor of 1% if paid in kind), and other market terms to be agreed and set forth in new secured term loan documents, consistent with the provisions set forth in the financing term sheet attached to the RSA, in each case acceptable to EIG in form and substance.

143.     EIG has consented to this treatment, subject to the terms and conditions of the RSA.

### C.     Exit Financing

144.     The Debtors' management may raise up to $5 million in financing (the "Exit Facility") in the form of an exit facility to be provided to the reorganized Debtors on the effective date, for purposes that include funding payments under the Plan. The Exit Facility will be subordinate to EIG's new secured term loan and any other creditors who are to receive cash payments under the Plan, and will be subject to other terms to be mutually agreed between the Debtors and EIG, and in a form and substance acceptable to the Debtors and EIG.

### D.     Governance

145.     The management and board of directors (if applicable) of the reorganized Debtors shall remain unchanged. The prepetition LLC Operating Agreements and any other organizational documents of the Debtors shall remain in full force and effect with respect to the reorganized Debtors.

### E.     Recoveries to Other Claim Holders

146.     With the exception of EIG, all other holders of claims will be paid the value of their claims in cash on the effective date of the Plan or (as is the case with PanAm) will receive the indubitable equivalent of their claims.

XI.     **First Day Motions**

147.     Along with this Declaration, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, minimize the adverse effects of the commencement of these Chapter 11 Cases, and facilitate the efficient administration of these Chapter 11 Cases. I have reviewed each of the First Day Motions. The factual statements in each of the First Day Motions are true and correct to the best of my knowledge, information, and belief. I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated September 18, 2021.

Richard H. Mills, Jr.
Manager of Tenrgys, LLC

**EXHIBIT A**

**ORGANIZATIONAL CHART**



Tenrgys, LLC
100%
Tellus Energy, LLC
“Upstream Debtors”
100%
Treetop Midstream Services, LLC
“Midstream Debtors”
100%
Top Ten, LLC
100%
Acadiana Mineral Owners. LLC
BAX, LLKC
BOE, LLC
Eutaw Ventures, LLC
LASO, LLC
NOMS, LLC
North Cohay, LLC
PCE, LLC
RFND, LLC
RFS, LLC
SNPI, LLC
100%
South Cohay, LLC
STP Ventures, LLC
Tallahala Exploration, LLC
TC Energy, LLC
Telpico USA, LLC
Jurassic Seismic Company
WCOA, LLC
Wayne T&T, LLC
Telpico, LLC
Telpico Colombia, LLC (branch)
Telpico Mexico S. de C.V. de R.L.
59%
Seismic Exploration, LLC
Dome Seismic, LLC
100%
Antioch Pipeline Company, LLC
BGGCO, LLC
Greenleaf CO2 Solutions, LLC
Highland Colony Capital, LLC
65%
Bluetick, Inc.
TPCO, LLC
XLake Pipeline Company, LLC
100%
BT Lands, LLC
BXO Lands, LLC
Cohay Conservation Area, LLC
Cohay Wildlife, LLC
Leaf River Land Co., LLC
WYC Lands, LLC
KEY
Debtor
Non-Debtor

**EXHIBIT B**

**PROJECTION**

**Tenrgys, LLC et al.**
**Monthly Cash Flow Projections**
*$ in 000's*

| Month | Post-Petition Sep-21 | Oct-21 | Nov-21 | Dec-21 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Oil & Natural Gas Receipts | $ 3,314 | $ 4,029 | $ 4,353 | $ 4,276 | **$ 15,972** |
| Midstream Receipts | 83 | 1,459 | 1,580 | 1,602 | **4,724** |
| **Total Receipts** | **$ 3,397** | **$ 5,488** | **$ 5,933** | **$ 5,878** | **$ 20,696** |
| | | | | | |
| **Operating Disbursements** | | | | | |
| LOE/Capex | $ (1,684) | $ (3,236) | $ (3,122) | $ (3,183) | **$ (11,224)** |
| Midstream Disbursements | (62) | (823) | (842) | (824) | **(2,552)** |
| Colombia Disbursements | (109) | (405) | (484) | (293) | **(1,291)** |
| Payroll & Benefits | (75) | (84) | (94) | (113) | **(367)** |
| Other Disbursements | (160) | (239) | (99) | (414) | **(912)** |
| **Total Operating Disbursements** | **$ (2,090)** | **$ (4,788)** | **$ (4,641)** | **$ (4,827)** | **$ (16,346)** |
| | | | | | |
| **Operating Cash Flow** | **$ 1,307** | **$ 700** | **$ 1,292** | **$ 1,050** | **$ 4,350** |
| | | | | | |
| **Restructuring Costs** | | | | | |
| Company Professionals | $ - | $ - | $ (332) | $ (1,199) | **$ (1,531)** |
| US Trustee | - | (38) | - | (121) | **(159)** |
| Other Restructuring Costs | (7) | - | - | - | **(7)** |
| **Total Restructuring Costs** | **$ (7)** | **$ (38)** | **$ (332)** | **$ (1,321)** | **$ (1,697)** |
| | | | | | |
| **Net Cash Flow** | **$ 1,300** | **$ 663** | **$ 960** | **$ (270)** | **$ 2,653** |

*Notes:*

*1) Projections include receipts and disbursements subsequent to the bankruptcy filing date.*

*2) Oil and gas strip pricing as of 9/1/2021.*

*3) Forecast assumes all accrued but unpaid professional fees are paid at emergence in December.*

*4) Forecast assumes Q4 2021 US Trustee fees are paid at emergence in December.*